Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Michael R. Lozeau (State Bar No. 142893)
Richard T. Drury (State Bar No. 163559)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205 (fax)
E-mail: michael@lozeaudrury.com
           doug@lozeaudrury.com

Attorneys for Plaintiff
CALIFORNIA COMMUNITIES AGAINST TOXICS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, an unincorporated non-profit association,<br><br>Plaintiff,<br><br>vs.<br><br>INTERNATIONAL PAPER COMPANY, a corporation, DOES 1 through 10,<br><br>Defendants. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT"), a California non-profit association, by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On September 5, 2014, Plaintiff provided notice of Defendants' violations of the Act, and of its intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant INTERNATIONAL PAPER COMPANY, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of CCAT's notice letter is attached

as Exhibit A, and is incorporated by reference.

3.       More than sixty days have passed since notice was served on INTERNATIONAL PAPER COMPANY and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.       Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

5.       This complaint seeks relief for discharges of storm water pollutants from Defendant INTERNATIONAL PAPER COMPANY'S ("IP" or "Defendant") recycling facility located at 12851 Alondra Bl. Norwalk, California ("the Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").  The violations are ongoing and continuous.

### III. **PARTIES**

6. Plaintiff CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT") is an unincorporated non-profit association under the laws of the State of California with its main office in Rosamond, California. To further these goals, CCAT actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7. Members of CCAT are living in the community in and adjacent to the San Gabriel River Watershed and in the vicinity of IP's Facility. CCAT is dedicated to the preservation, protection, and defense of the environment, particularly with respect to areas and waters near urban industrial communities. CCAT and its members are deeply concerned with protecting the environment in and around their communities, including the San Gabriel River Watershed. Members of CCAT use and enjoy the waters into which the Facility has caused, is causing, and will continue to cause, pollutants to be discharged. Members of CCAT use those areas to recreate and view wildlife, among other things. The Facility's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CCAT's members have been, are being, and will continue to be adversely affected by the failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by these activities.

8.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

9.     Plaintiff alleges on information and belief that Defendant IP, is a New York corporation that owns and operates the Facility in Norwalk, California.

10.     Upon information and belief, and upon that basis, PLAINTIFF alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to PLAINTIFF, who therefore sue said Defendants by such fictitious names. PLAINTIFF will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not IP is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by PLAINTIFF.

11.     IP and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendants.

## IV.   **STATUTORY BACKGROUND**

12.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES

permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

13.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

14.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits, including general NPDES permits, in California.

15.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

17.     The General Permit contains several prohibitions. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their

storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

18.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

19.    Dischargers must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992. The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)). The SWPPP's BMPs must implement BAT and BCT (Section B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)). The

SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Sections A(9), (10)).

20.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6).  Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

21.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

22.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether

pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, and total organic content or oil & grease, certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample...facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm

water discharges from the storm event."

23.     The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm water discharges shall be described. This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges and associated drainage area."  Section A(6)(a)(v).  The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that best management practices ("BMPs") are included in the Storm Water Pollution Prevention Plan to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are effective (Special Conditions D).  Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain

records of such observations.

24.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

25.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any dilution credits to be applied by dischargers.

26.     The Regional Board has identified beneficial uses of the San Gabriel River Watershed and established water quality standards for it in the "Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," (hereinafter "Basin Plan").  See California Regional Water Quality Control Board, Los Angeles Region, Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties (1995),

27.     The beneficial uses of these waters include, among others, municipal and domestic supply, agricultural supply, groundwater recharge, water contact recreation,

non-contact water recreation, warm freshwater habitat, cold freshwater habitat, and wildlife habitat. The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." Id. at 2-2. Contact recreation use includes fishing and wading. Id. Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the San Gabriel River for contact and non-contact water recreation.

28.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life." Id. at 3-16. The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." Id. at 3-11. The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses." Id. at 3-16. The Basic Plan provides that "[t]he pH of bays or

estuaries [or inland surface waters] shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges." Id. at 3-15.  The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."  Id. at 3-9.  The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."  Id.  The Basin Plan provides a Maximum Contaminant Level ("MCL") for aluminum of 1 mg/L.

29.     The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable (hereinafter "BAT") and best conventional pollutant control technology (hereinafter "BCT").  The following benchmarks have been established in EPA's Multi-Sector General Permit for pollutants discharged by IP: pH – 6.0 - 9.0 standard units ("s.u."), total suspended solids ("TSS") – 100 mg/L, chemical oxygen demand ("COD") – 120 mg/L, total organic carbon ("TOC") – 120 mg/L, magnesium – .064 mg/L, iron – 1.0 mg/L, aluminum – 0.75 mg/L, lead  – 0.014 mg/L, copper – 0.0038 mg/L, zinc – 0.04 mg/L. U.S. EPA, Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (2009) (hereinafter "MSGP").

30.     The EPA has adopted freshwater numeric water quality standards, known as Criteria Maximum Concentration (hereinafter "CMC") for zinc of 0.120 mg/L,

copper of 0.009 mg/L (CMC); and for lead of 0.065 mg/L (CMC).[1]  40 C.F.R. § 131.38.

31.    Wet-weather Total Maximum Daily Loads ("TMDLs") for metals zinc, iron and lead also are present for the Coyote Creek, which is an impaired water body for these metals. http://www.waterboards.ca.gov/rwqcb4/water_issues/programs/tmdl/Established/San%20Gabriel%20River%20Metals%20TMDL/final_sangabriel_metalstmdl_3-27-07.pdf

32.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation for all violations occurring through January 12, 2009, and $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

---

[1] The values for zinc, copper, and lead are expressed as a function of total hardness (mg/L) in the water body and correspond to a total hardness of 100 mg/L.  Measurement of hardness at the Facility in 2013-2014 calculated hardness at 15 mg/L.

COMPLAINT

## V.  STATEMENT OF FACTS

33.   On or before July 18, 2008, IP filed a NOI for the Facility.  On or about June 26, 2013, IP filed another NOI for the Facility (collectively "the NOIs").

34.   In the NOIs, IP certified that the Facility classified under SIC Code 5093 ("Scrap Recycling and Waste Recycling Facilities").  The Facility collects and discharges storm water from the industrial site into at least one outfall.  The Facility is 4.5 acres.  The outfall discharges into Los Angeles County's municipal storm sewer system which discharges into the Coyote Creek and then to the San Gabriel River. The majority of the Facility exterior is paved and used for receiving and storing paper materials for recycling and transfer by truck or rail car.

35.   Since at least October 5, 2011, IP has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board from three locations identified as outfalls 1, 2 and 3.  IP certified each of those annual reports pursuant to Sections A and C of the General Permit.

36.   Since at least October 5, 2011 the Facility has detected aluminum, copper, zinc, lead, TSS, TOC, COD and magnesium in storm water discharged from the Facility. Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values.  Levels of aluminum, copper, zinc and lead detected in IP's storm water have been outside of the parameters

for water quality standards and in violation of the narrative water quality standards established in the Basin Plan.

37.   The following discharges on the following dates contained concentrations of pollutants in excess of the numeric water quality standards or narrative water quality standards established in the Basin Plan and the California Toxics Rule:

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Standard or Cal. Toxics Rule | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 10/28/2013 | Aluminum | 2.5 mg/L | 1.0 mg/L (MCL) | West drain 1 |
| 10/28/2013 | Aluminum | 2.9 mg/L | 1.0 mg/L (MCL) | West drain 2 |
| 10/28/2012 | Aluminum | 4.8 mg/L | 1.0 mg/L (MCL) | West drain 3 |
| 2/8/2013 | Aluminum | 1.8 mg/L | 1.0 mg/L (MCL) | West drain 2 |
| 2/8/2013 | Aluminum | 1.8 mg/L | 1.0 mg/L (MCL) | West drain 3 |
| 12/12/2011 | Aluminum | 1.4 mg/L | 1.0 mg/L (MCL) | West drain |

| 10/5/2011 | Aluminum | 1.4 mg/L | 1.0 mg/L (MCL) | West drain |
|---|---|---|---|---|
| 10/28/2013 | Copper | .13 mg/L | .009 mg/L (CMC) | West drain 2 |
| 10/28/2013 | Copper | .17 mg/L | .009 mg/L (CMC) | West drain 3 |
| 2/27/2014 | Zinc | .16 mg/L | .12 mg/L (CMC) | West drain 1 |
| 2/27/2014 | Zinc | .16 mg/L | .12 mg/L (CMC) | West drain 2 |
| 2/27/2014 | Zinc | .18 mg/L | .12 mg/L (CMC) | West drain 3 |
| 10/28/2013 | Zinc | 1.5 mg/L | .12 mg/L (CMC) | West drain 1 |
| 10/28/2013 | Zinc | 1.7 mg/L | .12 mg/L (CMC) | West drain 2 |
| 10/28/2013 | Zinc | 1.6 mg/L | .12 mg/L (CMC) | West drain 3 |
| 2/8/2013 | Zinc | .26 mg/L | .12 mg/L (CMC) | West drain 1 |
| 2/8/2013 | Zinc | .34 mg/L | .12 mg/L (CMC) | West drain 2 |
| 2/8/2013 | Zinc | .34 mg/L | .12 mg/L (CMC) | West drain 3 |
| 12/12/2011 | Zinc | .74 mg/L | .12 mg/L (CMC) | West drain |
| 10/5/2011 | Zinc | .74 mg/L | .12 mg/L (CMC) | West drain |

COMPLAINT

| 12/12/2011 | Lead | .12 mg/L | .065 mg/L (CMC) | West drain |
|---|---|---|---|---|
| 11/8/2012 | Narrative | Slightly cloudy with oily sheen | narrative oil and grease standard | West drain |
| 12/5/2012 | Narrative | Slightly cloudy with oily sheen | narrative oil and grease standard | West drain |
| 12/8/2013 | Narrative | Opaque/muddy with oily sheen | narrative oil and grease standard | West drain |
| 5/6/2013 | Narrative | Brown with fuel smell | narrative oil and grease standard | West drain |
| 10/28/2013 | Narrative | Oil Sheen from truck traffic | narrative oil and grease standard | West drain |

The information in the above table reflects data gathered from IP's self-monitoring during the 2011-2012, 2012-2013 and 2013-2014 wet seasons.

38.     Discharges on the following dates from the Facility contained concentrations of pollutants in excess of the numeric EPA water quality benchmarks: October 28, 2013, February 8, 2013, October 12, 2011, October 5, 2011, February 27, 2014, for aluminum, copper, zinc, lead, TSS, COD and magnesium. The information reflects data gathered from IP's self-monitoring during the 2010-2011, 2011-2012, and 2012-2013 wet seasons.

39.     The level of TSS in storm water detected by the Facility has exceeded the benchmark value for TSS of 100 mg/L established by EPA.

40.   The level of COD in storm water detected by the Facility has exceeded the benchmark value of 120 mg/L established by EPA.

41.   The level of TOC in storm water detected by the Facility has exceeded the benchmark value of 120 mg/L established by EPA.

42.   The level of iron in storm water detected by the Facility has exceeded the benchmark value of 1.0 mg/L established by EPA.

43.   The level of aluminum in storm water detected by the Facility has exceeded the benchmark value of .75 mg/L established by EPA.

44.   The level of magnesium in storm water detected by the Facility has exceeded the benchmark value of .064 mg/L established by EPA.

45.   The benchmark values of some metals (ie. copper, lead, and zinc) are dependent on water hardness. For these parameters, permittees must determine the hardness of the receiving water (*see* Appendix J, "Calculating Hardness in Receiving Waters for Hardness Dependent Metals," for methodology), in accordance with Part 6.2.1.1, to identify the applicable 'hardness range' for determining their benchmark value applicable to their facility.

46.   The level of zinc, a hardness dependent metal, in storm water detected by the Facility has exceeded the benchmark value of between 0.04-0.26 mg/L, established by EPA.

47.   The level of copper, a hardness dependent metal, in storm water detected

by the Facility has exceeded  the benchmark value of .0038 mg/L, established by EPA.

48.    The level of lead, a hardness dependent metal, in storm water detected by the Facility has exceeded the benchmark value of .014 mg/L, established by EPA.

49.    On information and belief, Plaintiff alleges that IP did not conduct required numerical sampling during the 2009-2010 wet seasons, or required sampling as required for two events during the 2011-2012 and 2012-2013 wet seasons.

50.    CCAT further alleges that during the 2013-2014 wet seasons the Facility did not conduct visual observations for storm water discharges during November to May even though there were such events during these months.

51.    On information and belief, Plaintiff alleges that since at least November 5, 2009, IP has not implemented BAT and BCT at the Facility for discharges of aluminum, copper, zinc, lead, TSS, TOC, COD and magnesium, suspended materials, discoloration, floating materials and other pollutants.  Section B(3) of the General Permit requires that it implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.

52.    On information and belief, Plaintiff alleges that since at least November 5, 2009, IP did not implement an adequate Storm Water Pollution Prevention Plan for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for

the Facility that are consistent with BAT or BCT for the Facility.

53.    Information available to CCAT indicates that as a result of these practices, storm water containing excessive pollutants has been and is being discharged during rain events from the Facility directly to the County of Los Angeles storm drain system, which discharges to the San Gabriel River and Coyote Creek.

54.    Plaintiff is informed and believes that Defendants did not submit to the Regional Board, since at least November 5, 2009, an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and accurately certifying compliance with the General Permit Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit.

55.    Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

56.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

57.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendants have not implemented BAT and BCT at the Facility for discharges of aluminum, copper, zinc, lead, TSS, TOC, COD and magnesium, suspended materials, discoloration, floating materials and other pollutants in violation of Effluent Limitation B(3) of the General Permit.

58.     Each day, since November 5, 2009, that Defendants did not develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

59.     Defendants have not complied with the BAT/BCT requirements every day since November 5, 2009.  Defendants continue to not comply with the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

60.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

61.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to

cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

62.     Plaintiff is informed and believes, and thereupon alleges, that since at least November 5, 2009, Defendants have discharged polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

63.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

### THIRD CAUSE OF ACTION
**Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

64.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

65.     Section A and Provision E of the General Permit requires dischargers of

storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

66.   Defendants have not developed and implemented an adequate SWPPP for the Facility.

67.   Each day since November 5, 2009, that Defendants do not develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

## FOURTH CAUSE OF ACTION
### Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

68.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

69.   Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

70.   Defendants have not developed and implemented an adequate monitoring and reporting program for the Facility.  Defendants' lack of an adequate monitoring and reporting program is evidenced by, *inter alia*, the Facility's failure to conduct required numerical sampling during the 2009-2010 wet seasons, or required sampling as required for two storm events during the 2011-2012 and 2012-2013 wet seasons.

COMPLAINT

25

CCAT further alleges that during the 2013-2014 wet seasons the Facility did not conduct visual observations for storm water discharges during November to May even though there were such events during these months.

71.    Each day since November 5, 2009, that Defendants did not develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

## FIFTH CAUSE OF ACTION
### Certification of Compliance in Annual Report
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

72.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

73.    Defendants have not accurately certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least November 5, 2009.

74.    Each day since at least November 5, 2009, that Defendants do not accurately compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

COMPLAINT

a.  Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendants from discharging polluted storm water from the Facility unless authorized by the Permit;

c.  Enjoin Defendants from further violating the substantive and procedural requirements of the Permit;

d.  Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.  Order Defendants to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendants to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendants to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendants to pay civil penalties for all violations pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§

COMPLAINT

19.1 - 19.4;

   i. Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

   j. Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

   k. Award any such other and further relief, as this Court may deem appropriate.

Dated: _____11/5_____, 2014   Respectfully submitted,

           By: _____
             Gideon Kracov
             Attorneys for Plaintiff

             CALIFORNIA COMMUNITIES AGAINST
             TOXICS